UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

Louis Anthes,

        Plaintiff,
        in *Pro Se*


   against

New York University ("NYU"), New York University School of Law, and Dr. William E. Nelson,

        Defendants.

No.  1:17-cv-02511 (ALC)

---

## PLAINTIFF'S MEMORANDUM OF LAW RESPONDING IN OPPOSITION TO DEFENDANT(S)' MOTION TO DISMISS

Dr. Louis Anthes, Esq.
P.O. Box 2313
Long Beach, CA  90802
Tel: (562) 363-5052
dr.louis.anthes@gmail.com

*Attorney in Pro Se*

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................................ 1

A.      Defendant(s) Should File Answer to Complaint ............................................. 1

B.      Civil Rights Claims Prejudice Defendant(s)' Early Dismissal ...................................... 6

II.     FACTS ................................................................................................................. 10

A.      Judicial Notice ................................................................................................. 10

B.      Facts Already Alleged in the Complaint/FAC .......................................... 13

III.    THE ARGUMENT: Plaintiff's NYU Degrees Were/Became Fraudulent ..................... 15

A.      Fed.R.Civ.P. Rule 9(b) Is Satisfied ................................................................ 15

B.      Defendant(s)' Scienter: "Time-Barred" Defense Denied to Plaintiff.......................... 18

C.      Defendant(s)' Wrong-Doing Is Highly Plausible.......................................... 24

IV.     CONCLUSIONS.................................................................................................... 26

# TABLE OF AUTHORITIES

## Cases

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ............ 15

*Baker v. Cuomo*, 58 F. 3d 814, at 819 (2d. Cir. 1995) ..................................................... 7

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)
............................................................................................................................... 15

*Branch v. Tunnell*, 14 F.3d 449 (9th Cir.1994) ............................................................. 17

*Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991) ........................................................ 7

*Caviness v. Horizon Community Learning CtK, Inc.*, 590 F.3d 806 (9th Cir. 2010) ......... 9

*Escalera v. New York City Hous. Auth.*, 425 F.2d 853, 857 (2d Cir. 1970) ..................... 7

*Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995) ................................. 7

*George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1230 (9th Cir. 1996) ................... 9

*Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999) ........................................ 17

*Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) ............................................... 7

*Holmes v. New York City Hous. Auth.*, 398 F.2d 262, 264-65 (2d Cir. 1968) ................. 7

*Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997) ............... 18

*Koppel v. 4987 Corp.*, 167 F.3d 125, 127 (2d Cir.1999) ............................................... 18

*Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.1999) ................ 17

*MBIA Inc. v. Certain Underwriters at Lloyd's*, No. 14-cv-1769, 2014 U.S. Dist. LEXIS
97359, at *14-15 (S.D.N.Y. July 16, 2014) .................................................................. 2

*MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) ............................ 15

*Mir, M.D. v. Little Co. of Mary Hospital*, 844 F.2d 646, 649 (9th Cir.1988) ............. 15, 17

*Obergefell v. Hodges*, 135 S. Ct. 2071, 576 US __, 191 L. Ed. 2d 953 (2015) ............. 31

*Porter v. Groat*, 840 F.2d 255, 257 (4th Cir. 1988) ......................................................... 27

*Ross v. Mitsui Fudosan, Inc.*, 2 F.Supp.2d 522 (S.D.N.Y. 1998)..................................... 3

*Roth v. Jennings*, 489 F.3d 499, 512 (2d Cir.2007)......................................................... 16

*Salahuddin v. Cuomo*, 861 F.2d 40 at 43 (2d Cir.1988) ................................................... 3

*T.S. Haulers, Inc. v. Town of Riverhead*, No. 01 CV 4219(ADS)(MLO), 190 F.Supp.2d

    455, at 459 (2002) ....................................................................................................... 17

*Tarshis v. Reise Organization*, 211 F.3d 30, at 35 (2d Cir. 2000) ............................... 7, 9

*Thomas v. New York City*, 814 F. Supp. 1139 (E.D.N.Y. 1993) ...................................... 8

*Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) ......................... 18

## Constitutional Provisions

Fifth Amendment of the United States Constitution ......................................................... 24

Fourteenth Amendment of the United States Constitution ............................................. 23

Fourth Amendment of the United States Constitution ..................................................... 8

N.Y. CONST. art. I, § 12................................................................................................... 8

Thirteenth Amendment to the United States Constitution..................................... 8, 9, 24

## Rules

Fed.R.Civ.P. Rule 11(b)(3) .............................................................................................. 16

Fed.R.Civ.P. Rule 12....................................................................................................... 3

Fed.R.Civ.P. Rule 12(b)(6) .............................................................................................. 2

Fed.R.Civ.P. Rule 15....................................................................................................... 3

Fed.R.Civ.P. Rule 56....................................................................................................... 3

Fed.R.Civ.P. Rule 68 ................................................................................................. 3

Fed.R.Civ.P. Rule 8(a)(2) ........................................................................................ 3

Fed.R.Civ.P. Rule 9(b) ........................................................................................ 3, 18

Fed.R.Evid. Rule 201 ..................................................................................... 12, 15, 17

**Statutes**

18 U.S.C. § 242 ........................................................................................................ 8

28 U.S.C. §§ 620–629 .............................................................................................. 6

31 U.S.C. § 3729(a)(1)(G) ...................................................................................... 18

42 U.S.C. § 1983 ............................................................................................... 7, 8, 9

California Family Code §§ 760 and 771 ...................................................................... 30

College Cost Reduction and Access Act of 2007 (Public Law 110-84) ......................... 4

Federal False Claims Act ("FFCA"), 31 U.S.C. § 3729 ................................................ 18

Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G) ............................................... 8, 12

Higher Education Act ("HEA"), 20 U.S.C. § 1091a(a)(1) (as amended) ........... 21, 24, 26

Higher Education Act of 1965 (Public Law 89-329) ....................................................... 4

**Treatises**

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1221 ........... 3

Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 ........... 2

**Other Authorities**

American Historical Association, Statement on Standards of Professional Conduct
    (updated 2017), Section 6, "History in the Public Realm" ............................................ 5

Anthes, Louis, *Lawyers and Immigrants, 1870-1940* (New York: LFB Press, 2003) ....... 5

iv

Hartmann, Wendy E., Esq., *What LGBT Couples Should Know About Estate Planning*, The Wall Street Journal: Watching Your Wealth, June 28, 2017 ............................... 10

https://www.antislavery.org/slavery-today/debt-bondage/ ............................................. 30

IRS Agent Albert Ortiz (Field Assistance, Badge No. 1000523102) ............................... 4

IRS INFO 2009-0126, 2009 WL 1833452 (June 26, 2009) ............................................ 4

National Consumer Law Center, Student Loan Law ............................................... 23, 26

Nelson, William E., "Political Decision Making by Informed Juries," 55 Wm. & Mary L. Rev. 1149 (2014) ............................................................................................................... 29

Nelson, William E., *Justice Byron R. White: A Modern Federalist and a New Deal Liberal*, 1994 BYU L. Rev. 313 (1994).................................................................................... 5

UCC § 3-118 ................................................................................................................ 22

# I.    PRELIMINARY STATEMENT

The central issue raised by Plaintiff's lawsuit against Defendant(s) can be summarized succinctly as follows:  why are Defendant(s) spending thousands of dollars to defend themselves legally, when Defendant(s) could help Plaintiff retire his federal student loan debt facilitated by Defendant(s)?

Defendant(s) argue that Plaintiff's causes of action are "time-barred" and "implausible."  Plaintiff responds that ALL DEFENDANTS ALWAYS knew federal law abrogated Plaintiff's "time-barred" defenses pertaining to his debts Defendant(s) facilitated.  Plaintiff also argues that Defendant Dr. William Nelson, specifically, possesses the means and motive to leave Plaintiff in permanent indebtedness.  Plaintiff urges the Court to end weaponization of Plaintiff's student loan debts, by: 1) TAKING JUDICIAL NOTICE; 2) DENYING Defendant(s)' motion to dismiss and setting a calendar date for their answer; 3) GRANTING Plaintiff's motion for venue change to the United States District Court, Central District of California; and 4) GRANTING Plaintiff leave to file his [Proposed] Second Amended Complaint appearing in Plaintiff's affidavit concurrently filed with this memorandum.

## A.    Defendant(s) Should File Answer to Complaint

Before proceeding in substance to address the merits of Plaintiff's premise as set forth below in Section III.B and the merits of Plaintiff's affirmative argument in favor of the plausibility of the claims argued in the Complaint and First Amended Complaint ("FAC"),[1] Plaintiff urges the Court to oblige Defendant(s) to file a responsive pleading as a formal answer to Plaintiff's Complaint/FAC, or Proposed Second Amended Complaint ("PSAC") (see Plaintiff's Affidavit in Opposition to Motion to Dismiss, Exhibit A), either

---

[1]    See "Stipulation for Defendants to Accept Service and Set Deadline to Respond to Amended Complaint," which incorporated the original Complaint and accompanying exhibits into the First Amended Complaint (Docket No. 24).

before or after the Court rules on Plaintiff's motion for venue change.  Docket Nos. 43-45.  To obtain immediate relief and all further relief, Plaintiff continues to solicit the Court's willingness to grant his previous request for *pro bono* assistance, which was denied without prejudice by the Court.  Hr'g. Trans. at 7:2-3 (June 16, 2017).

Plaintiff concedes opposing counsel's wisdom in filing its motion to dismiss pursuant to Fed.R.Civ.P. Rule 12(b)(6) ("12(b)(6) Motion"), at this stage of the proceedings.  If Defendant(s) had filed a 12(b)(6) Motion presenting "time-barred" defenses after their answer(s), opposing counsel could have forfeited such defenses and thereby wasted the opportunity to argue such at all.[2]  Even though the opportunity exists now for Defendant(s) to raise "time-barred" defenses, prior to filing an answer, their choice of opportunity now, in and of itself, should in no way buttress[3] their assertions of defenses, about which the Court will rule by accepting "all factual allegations in the complaint as true, and draw all reasonable inferences in the plaintiff's favor."  *MBIA Inc. v. Certain Underwriters at Lloyd's*, No. 14-cv-1769, 2014 U.S. Dist. LEXIS 97359, at *14-15 (S.D.N.Y. July 16, 2014) (citing Defendant(s)' motion to dismiss, memorandum of law at page three).

Indeed, any plaintiff has a reasonable expectation to an affirmative answer to a non-frivolous complaint.  "Dismissal is reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised."  *Ross v. Mitsui Fudosan, Inc.*, 2 F.Supp.2d 522 (S.D.N.Y. 1998) (quoting *Salahuddin v. Cuomo*, 861 F.2d 40 at 43 (2d Cir.1988)).  For this reason,

---

[2]    "A motion made under Rule 12(b)(6) that raises the defense of failure to state a claim upon which relief may be granted must be made before the service of a responsive pleading, but according to Rule 12(h)(2) the defense is preserved and may be raised as late as trial.  Technically therefore, a post-answer Rule 12(b)(6) motion is untimely and the cases indicate that some other vehicle … must be used to challenge the plaintiff's failure to state a claim for relief." (citing Vol. 5B, Chp. 4 at 408, Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 (3d ed. 2004)).

[3]    "All federal courts are in agreement that the burden is on the moving party to prove that no legally cognizable claim for relief exists."  Wright & Miller, vol. 5B § 1357 at 456-462.  Opposing counsel uses the phrase "TIME-BARRED" in the "Table of Contents" for their supporting law memo like a machine gun.

Defendant(s)' 12(b)(6) Motion is subject to a number of concomitant obstacles, including the constraint that the Federal Rules of Civil Procedure harmonize, including Fed.R.Civ.P. 12 with itself (e.g., 12(b)(6), 12(e) and 12(h)(2)) and with others, such as Fed.R.Civ.P. 8, 9, 15, 56, and 68.[4]  The Court evaluates any motion to dismiss in the context of other rules and statutes, setting forth alternatives for the plaintiff, like changing venue, pleading a more definite statement, and/or amending the complaint.

To Plaintiff's belief and knowledge, Defendant(s) have not proposed, as of yet, any opposing facts arising to a time-line, leaving Plaintiff's references in all pleadings regarding dates as the relevant calendar to evaluate Defendant(s)' motion to dismiss. And further, Plaintiff asks the Court and all parties to notice:  the United States Internal Revenue Service ("IRS") may impose an obligation on households, if spouses file jointly and one spouse obtains a discharge of student loan debt in federal bankruptcy court,[5] thus exposing the husband of Plaintiff Dr. Louis Anthes, Mr. Jeremiah Taimi Malumaleumu (an un-named party in this litigation presently, see Docket No. 31), to federal tax liabilities arising from bankruptcy relief even if possibly obtainable (FAC 14:27-28, 17:3-6, 12-28, 18:1-12; Docket No. 31) by Mr. Malumaleumu's spouse[6], Dr.

---

[4]    On the relevance of Fed.R.Civ.P. Rule 8(a)(2) and its "liberal" pleading requirements, see Wright & Miller, vol. 5 § 1221.  For further discussion of Fed.R.Civ.P. Rule 9(b), specifically, applying to Plaintiff's claims of Defendant(s)' Fraud, see below at Sec. III.B.  Fed.R.Civ.P. Rule 15 permits the Defendant(s), or the Court, to grant Plaintiff leave to file a Second Amended Complaint, as requested in Plaintiff's motion for change of venue and in this response in opposition. On the relationship between Fed.R.Civ.P. Rule 12 (Motion to Dismiss) and Fed.R.Civ.P. Rule 56 (Summary Judgment), see Fed.R.Civ.P. Rule 12(d) (referencing Fed.R.Civ.P. Rule 56).

Plaintiff notes that, on two occasions, May 24, 2017 and June 29, 2017, he has invited Defendant(s) to offer settlement terms to Plaintiff, pursuant to Fed.R.Civ.P. Rule 68, "Entry of Judgment" (N.B.: Docket No. 49 is a one-page letter containing one error of dating, about which Plaintiff has already informed the Court and defense counsel in an email sent to them on August 1, 2017).

[5]    IRS INFO 2009-0126, 2009 WL 1833452 (June 26, 2009) (a general information letter concerning "a student loan forgiveness program enacted as section 401 of the College Cost Reduction and Access Act of 2007 (Public Law 110-84) and codified at § 455(m) of the Higher Education Act of 1965 (Public Law 89-329) (HEA). … Section 61(a) of the Code provides that, except as otherwise provided in subtitle A, gross income means all income from whatever source derived.  <u>Section 61(a)(12) provides that gross income includes income from discharge of indebtedness</u>)" (emphasis added).

[6]    Mr. Malumaleumu and Dr. Anthes are married and subject to the "community property laws" of the State of California.  If they, as a married couple, file federal taxes jointly, as they do now, then any

Anthes[7].  In other words, the interests of justice, as well as those of Mr. Malumaleumu, who has financed this litigation exclusively with his resources, require a broad cognizance of the consequences of hastily dismissing Plaintiff's claims in the United States District Court of the Southern District of New York.

The Court cannot ignore that Plaintiff has requested judicial notice of his graduate degrees in law and United States history from New York University ("NYU"). Docket Nos. 39-42.  In fact, from 1993-2000, at NYU, Plaintiff Louis Anthes pursued professional credentialing as a historian of United States legal history for both the history profession (doctorate and dissertation) and in the legal profession (juris doctor). That Plaintiff's litigation is part of an effort, opposed to mere scholasticism, to document legal history legally, i.e., among legal historians in a federal court,[8] for possible use in discussions with the United States Treasury Department and the United States Department of Education, underscores the imperative to uncover any fraud by Defendant(s) about Plaintiff's marketable NYU credentials and his scholarly publications based in argument and evidence.[9]  According to the American Historical Association, Statement on Standards of Professional Conduct (updated 2017), Section 6, "History in the Public Realm" ("https://www.historians.org/jobs-and-professional-development/statements-standards-and-guidelines-of-the-discipline/statement-on-standards-of-professional-conduct#PublicRealm"):

---

liabilities accruing to Plaintiff specifically could and would also accrue to Mr. Malumaleumu.

[7]    Regarding the matter of litigating student loan debt declared "earned income" by the IRS, post-bankruptcy discharge, IRS Agent Albert Ortiz (Field Assistance, Badge No. 1000523102), on September 5, 2017 in Los Angeles, California, stated in-person to Plaintiff and Plaintiff's husband, "Federal tax court is the appropriate venue, because there is a dispute and that is something a judge will have to rule on."

[8]    Dr. William Nelson clerked with United States Supreme Court Justice Byron White, during the October 1970 term.  See William E. Nelson, *Justice Byron R. White: A Modern Federalist and a New Deal Liberal*, 1994 BYU L. Rev. 313 (1994).

[9]    Dr, Louis Anthes has published one scholarly monograph, Louis Anthes, *Lawyers and Immigrants, 1870-1940* (New York: LFB Press, 2003), based entirely on his Ph.D. dissertation, and he published, during 1993-2001, about a half-dozen scholarly works during while at NYU and later Clemson University.

> Historians who work in government, corporate, and nonprofit
> institutions, as well as those occasionally entering public arenas as
> political advisers, expert witnesses, public intellectuals, consultants,
> legislative witnesses, journalists, or commentators, may face a choice
> of priorities between professionalism and partisanship.  They may want
> to prepare themselves by seeking advice from other experienced
> professionals.  As historians, they must be sensitive to the complexities
> of history, the diversity of historical interpretations, and the limits as well
> as the strengths of their own points of view and experiences and of the
> discipline itself.  In such situations, historians must use sources,
> including the work of other scholars, with great care and <u>should always
> be prepared to explain the methods and assumptions in their research;
> the relations between evidence and interpretation; and alternative
> interpretations of the subjects they address</u>.  (Emphasis added.)

It is not merely a rhetorical question, therefore, to ask Defendant(s), and specifically

including Dr. William Nelson, to explain persuasively, and for and on the record, why

Plaintiff is ineligible to use NYU credentials to retire Plaintiff's federal debt obligations

incurred exclusively during his enrollment in two NYU professional programs, directly

related to his subsequent publishing and continuing law licensing.

Moreover, and to the same point, Plaintiff notes that federal law established the

"Federal Judicial Center," pursuant to 28 U.S.C. §§ 620–629, which though not directly

relevant to these proceedings, has the purpose of furthering "the development and

adoption of improved judicial administration in the courts of the United States,"

including, under §620(b)(1) of the same statute, "to conduct research and study of the

operation of the courts of the United States, and to stimulate and coordinate such

research and study on the part of other public and private persons and agencies."

Defendant Dr. William E. Nelson is a former Clerk of the United States Supreme Court

and his NYU faculty website displays him having published nearly a dozen books in

United States Legal History.  The broad interests of justice indicate postponement of

Defendant(s)' dismissal, if appropriate, until Plaintiff and the Court obtain either: 1) Dr.

Nelson's answer to Dr. Anthes' complaint/FAC or PSAC; and/or, 2) Dr. Nelson's

deposition under oath in this controversy.

### B. <u>Civil Rights Claims Prejudice Defendant(s)' Early Dismissal</u>

Without proceeding in this restricted response to a rigorous analysis of the various Civil Rights claims appearing in the Complaint/FAC, Plaintiff asks the Court to recognize, solely in the context of deciding whether to deny the 12(b)(6) Motion, that Plaintiff's Civil Rights claims, pursuant to 42 U.S.C. § 1983, even if untypical or unfamiliar, prejudice Defendant(s)' 12(b)(6) Motion. "This rule barring the granting of a motion to dismiss has for many years been carefully adhered to in this Circuit, particularly in civil rights actions." *Tarshis v. Reise Organization*, 211 F.3d 30, at 35 (2d Cir. 2000) (citing *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995); *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994); *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991); *Escalera v. New York City Hous. Auth.*, 425 F.2d 853, 857 (2d Cir. 1970); *Holmes v. New York City Hous. Auth.*, 398 F.2d 262, 264-65 (2d Cir. 1968)). Plaintiff's Civil Rights claims, in and of themselves, have the legal effect of disadvantaging Defendant(s)' early 12(b)(6) Motion, and advantaging the Plaintiff's early opposition to the same motion. *Baker v. Cuomo*, 58 F. 3d 814, at 819 (2d. Cir. 1995) ("case raises novel and important legal issues that require more thorough consideration than a *sua sponte* dismissal pursuant to Rule 12(b)(6) filed without any response from defendants"); *Thomas v. New York City*, 814 F. Supp. 1139 (E.D.N.Y. 1993).

Running parallel to Plaintiff's other causes of action, such as allegations Defendant(s) violated the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G) (Compl. at 5-7; FAC at 14:17-28, 15, 16:1-9), Plaintiff's contentions include two sets of different facts, presently known to Plaintiff, which constitute the cores of two different bases of <u>Civil Rights</u> claims in this litigation:

  i. facts pertaining to Defendant(s)' facilitation of Plaintiff's non-dischargeable

indebtedness resulting in violation of the Thirteenth Amendment to the United States Constitution (Compl. at 7; FAC at 17:11-28, 18:1-21), and in deprivations of rights under color of law, 18 U.S.C. § 242 (not enforceable in this civil action) **and** 42 U.S.C. § 1983; and,

ii.  facts pertaining to Defendant(s) aiding and abetting, and/or conspiring, in violating 42 U.S.C. § 1983, the Fourth Amendment of the United States Constitution, and N.Y. CONST. art. I, § 12 by colluding with the New York City Department of Finance ("NYCDF"), and/or its employees, to obtain actionable IRS data about Plaintiff (and his spouse since their domestic partnership in 2011 and their marriage in 2013), over the last fifteen years or more, as Plaintiff reported to the United States Attorney's Office for the Southern District of New York in 2015 (Compl. at 5 and Ex. B; FAC at 13:22-28, 14:1-7, 18:23-28, 19:1-9).

In so far as Plaintiff is using 42 U.S.C. § 1983 against a non-profit entity (New York University and its schools and employees), Plaintiff argues that a non-profit school can be considered a state actor if the Court looks at the specific conduct at issue. *Caviness v. Horizon Community Learning CtK, Inc.*, 590 F.3d 806 (9th Cir. 2010) (citing *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227, 1230 (9th Cir. 1996)).

Regarding the first fact-based set of Civil Rights violations allegations, above, Plaintiff alerts the Court and all parties that he feels inconvenienced by the use of the "third-person narrator" for the purpose of drafting this Response in *pro se*, and despite such, Plaintiff wishes to emphasize, though it need not be said, that he is **NOT** shackled and subjected to routine physical punishments, routine verbal degradation, extended starvations, coerced labor, appraisals as chattel, or forced reproduction.  Instead, Plaintiff reads the Thirteenth Amendment broadly to cover student loan indebtedness in

severe cases, and this specific claim warrants judicial scrutiny to avoid a hasty and

unjust dismissal.  *Tarshis* at 35.  Plaintiff is entirely supported by his spouse, has been

ruled ineligible within the last five years for state and federal disability assistance, has

no assets or income of his own[10], is indebted to the federal government, is diagnosed

clinically depressed, and can prove to the Court that his immediate employment options,

even at a $15/hour minimum wage, hypothetically, but mathematically[11], cannot satisfy

Plaintiff's needs while retiring his obligation to the federal government, even with

lowered installment payments.  Plaintiff alleges the foregoing are non-conclusory facts

revealing Plaintiff's long-term exposure to a combination of poverty, simple marital

support and/or low-wage labor without a realistic chance for bankruptcy relief about his

federal debt.  This has been true for years and shows no sign yet of changing.

Regarding the second set of fact-based Civil Rights violations allegations, above,

Plaintiff has already provided to Defendant(s) two copies of documents substantiating

the acquisition by NYCDF of Plaintiff's IRS data, and Plaintiff's spouse's IRS data, as

---

[10]    Even though Plaintiff is named as the non-revocable beneficiary of his spouse's state pension, the "non-revocable" classification of Plaintiff's asset could be subjected to challenges on a number of grounds in adversarial proceedings, including those brought by third parties, which Plaintiff and his spouse are currently trying to guard against with the assistance of an experienced family law and estate planning attorney.  In general, see, Wendy E. Hartmann, Esq., *What LGBT Couples Should Know About Estate Planning*, The Wall Street Journal: Watching Your Wealth, June 28, 2017.  Plaintiff and his spouse exclusively retained Attorney Hartmann as their family law and estate planning attorney, starting on or about September 2013 and terminating in June 2017.

[11]    See Compl. Ex. B:  Plaintiff IRS reported adjusted gross income, 2001-2017 (per tax year period): [single], $30,449 (2001), non-disclosed (2002), $4,365 (2003), $19,506 (2004), $21,785 (2005), $19,739 (2006), $13,381 (2007), $5,176 (2008), [Plaintiff's California State Bar Admission, 2009], $5,600 (2009), $6,450 (2010), [Plaintiff's Request for *In Forma Pauperis* status denied by U.S. Bankruptcy Court (2010)], [Married Filing Separately], $0 (2011), [Single], $0 (2012), [Married Filing Joint, reported self-employment taxable income], $2,889 (2013), $0 (2014), $0 (2015), $0 (2016).
        Plaintiff's most recent demand from the USDOE's loan servicer, "Nelnet," dated July 19, 2017, for monthly payment is $1,926 (rounded).  Working at 40/hours per week, at $15/hour, Plaintiff would earn about $2400/month gross, and this amount, after withholding of taxes and insurances, would approximately equal the $1,926 demanded by Nelnet:  At $15/hour, Plaintiff would be working only to pay his student loan debt, and continue to rely entirely upon his spouse for all other support, such as housing, food, phone, medical insurance, clothing, transportation, etc.  Any income-based repayment status would automatically force Plaintiff to include his spouse's pension income as a source of his income for the purpose of calculating his qualification for any income-based repayment assistance.  Consequently, as his reported income would increase, the amount of qualifying assistance would decrease in proportion.

well as Plaintiff's efforts to determine the cause of this data-collection, its lawfulness[12]
and its scope.  Compl. at Ex. B (providing tables of content for 500-page document
submission proffered to defendants prior to litigation); Hr'g Trans. at 5:23-25, 6:1-5
(June 16, 2017).  Defendant(s) have not offered any acknowledgement of the facts
Plaintiff has provided to Defendant(s) about collaboration between the NYCDF and the
IRS, and the potential interests any of the Defendant(s), or their agents, may have
(including a potential cover-up) by colluding in unlawful IRS data collection activities by
New York City government.

Defendant(s)' "Preliminary Statement" appearing in their 12(b)(6) Motion
mischaracterizes Plaintiff's claims, literally on page one[13]:  "The central factual
allegations underlying Dr. Anthes's claims are that he has been unable to obtain
sustained employment since 2001 and, as a result, has been unable to repay the
student loans he incurred during his graduate education at NYU. He does not allege any
actions of any kind on the part of Defendants since 2001."  Contradicting the preceding,
Plaintiff identified specific years – 2002, 2003 and 2007 – when Plaintiff indicates he
physically visited NYU's campus to raise matters concerning his student loan debt
obviously without success.  FAC at 4:7-28.  Plaintiff identified the year 2015 as the
specific year in which he first learned of likely wrong-doing on the part of Defendant(s)
(Compl. at 5; FAC at 13:22-28, 14:1-7) which, when interpreted alongside the statement
"We learned nothing," attributed to Plaintiff's dissertation advisor, Dr. Hasia Diner,

---

[12]    On July 10, 2015, Plaintiff sent a "Cease and Desist" letter to the IRS regarding allegations the
NYCDF was violating Plaintiff's privacy rights:  via facsimile (877-807-9215) and United States mail (FOIA
Requester Service Center, FOIA Public Liason, Rhonda O'Reilly, HQ FOIA, Stop 211, P.O. Box 621506,
Atlanta, GA, 30362-3006).  The same was also sent on the same date to the Treasury Inspector General
of Tax Administration, Hotline:  via United States mail (P.O. Box 589, Ben Franklin Station, Washington,
D.C. 20044-0589).

[13]    "Plaintiff objects to and denies any claims of ignorance on the part of Defendants, jointly or
severally, concerning Plaintiff's efforts to obtain Defendants' attention and assistance prior to
commencement of this action.  In so far as Defendants claim ignorance about Plaintiff's past efforts at
communicating with Defendants, Plaintiff alleges Defendant(s)' claims of ignorance are poor camouflage."
FAC 5:1-7.

regarding Plaintiff's dissertation in the year 2000 at his five-member committee dissertation defense (FAC 10:6-8), suggests Plaintiff's allegations of fraud also involve a cover-up by Defendant(s).  Further, Plaintiff in May 2017 privately made opposing counsel aware of specific hearsay evidence (an email dated April 2015 from a close former associate (Dr. Edward Purcell) sent to Plaintiff specifically on behalf of Defendant Dr. William Nelson) which shows an effort, specifically by Dr. William Nelson, to obstruct Plaintiff's attempt in 2015 – the same year he discovered NYDCF-IRS collusion – to obtain Defendant(s)' student loan debt repayment assistance, which Plaintiff alleges to be an obstruction in violation of the Federal False Claims Act, 31 U.S.C. § 3729(a)(1)(G).  Compl. at 5-7; FAC at 14:17-28, 15, 16:1-9.

As discussed below, "implausibility" is a legal defense.  In and of itself, it cannot be used simply to thwart answering Civil Rights violations allegations which Plaintiff established based on non-conclusory facts, and will continue to establish with discovery.  Defendant(s) may be inconvenienced by Plaintiff's Civil Rights claims, but Plaintiff argues his claims seriously.  The Court is urged to postpone a ruling on Defendant(s)' 12(b)(6) Motion due to Plaintiff's Civil Rights claims alone, until at least Defendant(s) have filed their answer(s) to the Plaintiff's Complaint/FAC, and/or Plaintiff's PSAC.

## II.    FACTS

### A.    Judicial Notice

At the request of the Court at hearing (see Docket No. 50), Plaintiff filed a motion for judicial notice, pursuant to Fed.R.Evid. Rule 201.  Concurrently filed with the aforementioned motion on July 17, 2017 (correcting drafting error dating motion as "July 28, 2017", (Docket No. 42)), Plaintiff proposed an order granting motion ("[Proposed] Order for Judicial Notice") economically summarizing less than ten (10) material facts

and factual claims, for the purpose of advancing these proceedings and "guiding Defendant(s) to prepare responsive pleadings going forward, by <u>constraining easily resolved uncertainties and needless controversies.</u>"  Docket No. 40 at 11:2-4 (emphasis added).

To wit (verbatim recitation of Plaintiff's [Proposed] Order for Judicial Notice):

i.  Since 2009, Louis Anthes has been an attorney in active and good standing with the State Bar of California (license no. 263059).  (Exhibit A, original Plaintiff's Motion for Judicial Notice, and additionally, Exhibit K of the same).

ii.  Jeremiah Malumaleumu and Louis Anthes, on November 26, 2013, were married in Norwalk, California, and they have remained so since, mutually showing the Court their intention to remain so.  (Exhibit B, original Plaintiff's motion for Judicial Notice, and additionally, Plaintiff's Supplemental Declaration, and additionally Affidavit by Jeremiah T. Malumaleumu, Docket No. 31).

iii.  Without finding any truth as to the following claims, judicial notice is taken of Louis Anthes claiming dependency upon his spouse, including financing this litigation, and he claims no further assets outside his marriage to Jeremiah T. Malumaleumu.  (Plaintiff's Motion for In Forma Pauperis, Docket No. 4, and additionally, Letter from U.S.D.O.E. to U.S. Senator Dianne Feinstein, Re: Louis Anthes, Orig. Compl. at Ex. "C").

iv.  Louis Anthes is the author of the published work of historical scholarship, "Lawyers and Immigrants" (2003), based on his doctoral dissertation (2000), supervised by Dr. William E. Nelson of New York University. (Exhibit C, original Plaintiff's Motion for Judicial Notice, and additionally, Exhibit D of the same).

11

    v.   Louis Anthes legally changed his name in 2011, and in doing so recorded in writing his formal "conversion" from the Christian faith to an affirmative atheist, under the penalties of perjury in the State of California.  (Exhibit E, original Plaintiff's Motion for Judicial Notice, and additionally, Exhibit F of the same).

   vi.   Defendant(s) variously coordinate their professional activities according to specific academic calendars pertaining to the same university community, which may have a foreseeable impact on discovery proceedings in this case (Exhibit G, original Plaintiff's Motion for Judicial Notice, and additionally, Exhibit H of the same).

  vii.   Defendant Dr. William E. Nelson appears as himself and in his professional academic capacity on a website which is owned and operated by New York University.  (Exhibit I, original Plaintiff's Motion for Judicial Notice).

 viii.   Dr. Duane Corpis, alleged by Plaintiff as a precipitating factor in Plaintiff's litigation in Plaintiff's First Amended Complaint, appears as himself and in his professional academic capacity on a website which is owned and operated by New York University.  (Exhibit J, original Plaintiff's Motion for Judicial Notice).

   ix.   Additionally, without any finding of truth by this Court, judicial notice is taken of Plaintiff's three [sic: "four"] "Supplemental Exhibits L-O" for the sole purpose of Plaintiff's Change of Venue Motion, separately filed in this case, and its due process analysis regarding jurisdiction over this litigation in the United States District Court, Central District of California.

At this time, and to his belief and knowledge, Plaintiff has supplied the Court with the

"necessary information," as per Fed.R.Evid. Rule 201, for the Court to take judicial notice of, at least, these above facts and factual claims.  It is proper "for the district court to 'take judicial notice of matters of public record outside the pleadings' and consider them for purposes of the motion to dismiss."  *Mir, M.D. v. Little Co. of Mary Hospital*, 844 F.2d 646, 649 (9th Cir.1988) (citing *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986)).

## B. <u>Facts Already Alleged in the Complaint/FAC</u>

Whether the 12(b)(6) Motion is considered by the Central District of California, at a later time, or whether the 12(b)(6) Motion is decided now by the Southern District of New York, the United States Supreme Court set forth the same threshold:  "A complaint that "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Avoiding "labels and conclusions" and also avoiding a "formulaic recitation of the elements of a cause of action" do not require that the plaintiff detail the factual allegations in the complaint.  As *Iqbal* indicates, the plaintiff merely needs to provide "factual content" which allows the court to make "reasonable inferences" while vetting the articulated causes of action.  *Id.* at 678.  Hence, the law concerning any 12(b)(6) Motion leads the court to take an active role in drawing reasonable inferences from the record, given the lack of requirement upon plaintiff to provide detailed allegations in the complaint.  It is only after all non-conclusory facts have been assumed in the favor of the plaintiff, and only after the court draws reasonable inferences in favor of the plaintiff, that "the court must determine whether the complaint alleges a plausible claim for relief." *Id.* at 679.  Further discussion about the plausibility of Plaintiff's claims appear

below.

Specifically, Plaintiff certifies, to his belief and knowledge, that the factual contentions alleged in the Complaint/FAC and PSAC have "evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. Rule 11(b)(3). Defendant(s) have been made aware of include the two copies of nearly 500 pages of bound documents submitted to Defendant(s) prior to the commencement of this litigation. Compl. at Ex. B; Hr'g Trans. at 5:23-25, 6:1-5 (June 16, 2017). A copy of the pages from the tables of contents pertaining to this Proffered Evidence was included as "Exhibit B" to Plaintiff's original Complaint and incorporated by stipulation in Plaintiff's FAC. Docket No. 24 and also in Plaintiff's PSAC. Plaintiff has not filed this aforementioned 500-page document with the Complaint/FAC or PSAC, out of necessity for making limited use of the Court's resources: "[t]he pleading of additional evidence, beyond what is required to enable the defendant to respond, is not only unnecessary, but in contravention of proper pleading procedure." *Roth v. Jennings*, 489 F.3d 499, 512 (2d Cir.2007) (alteration in original) (internal quotation marks omitted). However, frequent reference has been made to the exhibits appearing in Plaintiff's Complaint/FAC,[14] where the aforementioned 500-page document's table of contents is specifically referenced and cited.

Regarding the 12(b)(6) Motion, the Court[15] confines its consideration "'to facts stated on the face of the complaint, in documents appended to the complaint or

---

[14]    Reference made to relevant exhibits in original Complaint at 1:22, 4:18, and 7:26; References made to exhibits in FAC at 3:14, 5:27, 11:25, and 24:14. Additional references are made in Plaintiff's motion for judicial notice (Docket Nos. 39-42) and motion for venue change (Docket Nos. 43-45).

[15]    In California, reviewing a 12(b)(6) motion, the United States Court of Appeals for the Ninth Circuit ruled in *Branch v. Tunnell*, 14 F.3d 449 (9th Cir.1994) that a court may "consider exhibits submitted with the complaint." *Id.* at 453-54. Also, a court may consider documents which are not physically attached to the complaint but "whose contents are alleged in [the] complaint and whose authenticity no party questions." *Id.* at 454. Further, it is proper for the court to consider matters subject to judicial notice pursuant to Fed.R.Evid. Rule 201. See above *Mir, M.D.*

incorporated in the complaint by reference, and to matters of which judicial notice may be taken.' *T.S. Haulers, Inc. v. Town of Riverhead*, No. 01 CV 4219(ADS)(MLO), 190 F.Supp.2d 455, at 459 (2002) (quoting *Leonard F. v. Israel Discount Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir.1999); citing *Hayden v. County of Nassau*, 180 F.3d 42, 54 (2d Cir.1999)).  "The Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff."  *T.S. Haulers* at 460 (citing *Koppel v. 4987 Corp.*, 167 F.3d 125, 127 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir.1997)). "<u>The issue to consider is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.</u>"  *Id.* (citing *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995)) (emphasis added).

### III.   THE ARGUMENT:
### Plaintiff's NYU Degrees Were/Became Fraudulent

#### A. Fed.R.Civ.P. Rule 9(b) Is Satisfied

As per Fed.R.Civ.P. Rule 9(b):  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  In the Complaint/FAC, Plaintiff made particular allegations about the Defendant(s)' fraud:

> i.  "a party must state with particularity the circumstances constituting fraud or mistake": <u>legal</u> circumstances:  Complaint: Federal False Claims Act ("FFCA"), 31 U.S.C. § 3729; FAC: 31 U.S.C. § 3729(a)(1)(G) (Compl. at 5-7; FAC at 14:17-28, 15, 16:1-9) ("The FFCA creates a statutory duty by imposing civil liability on any person who 'knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government' " (FAC at 15:4-7) (citing 31 U.S.C.

§ 3729(a)(1)(G)))(Plaintiff notes that the Federal False Claims Act allows Plaintiff to file and prosecute lawsuits in the name of the United States against entities that make false or fraudulent claims to the United States for payment of services and products, citing 31 U.S.C. § 3730(b));

ii. "a party must state with particularity the circumstances constituting fraud or mistake": <u>factual</u> circumstances:  **a)** Plaintiff graduated from NYU with his J.D. and Ph.D., graduating with over $100,000 in student loan debt (currently over $200,000 and non-dischargeable), exclusively obtained while at NYU (Compl. at 4:22-28), but even so, Plaintiff published his dissertation as a book in 2003 and was admitted to the California State Bar in 2009 (Docket Nos. 39-42); **b)** "Defendant Dr. Nelson assured Plaintiff that NYU School of Law's 'Loan Repayment Assistance Program' was available to Plaintiff, like all NYU School of Law alumni" (FAC: 9:13-16); **c)** Plaintiff's dissertation advisor, Dr. Hasia Diner, ruled "We learned nothing" during Plaintiff's dissertation defense in the autumn of 2000 and said so in front of the whole defense committee including Defendant Dr. Nelson, who persuaded the committee to endorse Plaintiff's dissertation nonetheless (FAC at 10:2-15); **d)** Plaintiff alerted Defendant Dr. Nelson of Plaintiff's impending termination of employment at Clemson University in the summer of 2001 before termination happened in September 2001, and Defendant Dr. Nelson offered no immediate or near-term assistance (alleged for the first time here, and re-alleged in the PSAC); **e)** Plaintiff made visits to the physical campus of NYU in 2002, 2003, and 2007, contrary to Defendant(s) assertions with an intent of discussing his student loan debt (FAC: 4:7-28); **f)** Plaintiff received an email from Dr. Edward Purcell in April 2015 indicating Defendant Dr. Nelson, specifically, was

16

directing Plaintiff away from discussions about Plaintiff's eligibility for NYU's Loan Repayment Assistance Program (defense counsel received notice about this email in May 2017, and the existence of this email is re-alleged in the PSAC); **g)** Plaintiff obtained IRS records in 2015 showing tax return data sharing with the NYCDF pertaining to Plaintiff and (his spouse since 2011) going back to at least 2001 (Compl. at 5:3-17; FAC at 13:22-28, 14:1-7); **h)** Plaintiff received a phone call in March 2017 from NYU employee Dr. Duane Corpis, who threatened Plaintiff with a lawsuit (FAC at 3:2-10); **i)** Plaintiff's has been exposed, over a long period of time, to a combination of poverty, simple marital support and/or low-wage labor without a realistic chance for bankruptcy relief about his federal debt, even though Plaintiff remains an active member of the California State Bar since 2009 and in good standing as of 2017 (Compl. at Ex. B; alleged above, re-alleged in the PSAC).

iii.  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged **generally**":  Defendant Dr. Nelson's state of mind has been alleged in the Complaint/FAC **generally** (emphases added):  "As previously alleged in the original Complaint (Compl. at 5-7), Plaintiff claims that Defendants, with the intent of deceiving Plaintiff, and with the intent of benefitting from deception, have pushed Plaintiff into a state of medical disability nearly twenty years after facilitating and accepting Plaintiff's student loan disbursement" (FAC at 14:18-23); "Plaintiff claims Defendants' [sic] have an interest, related to student loan debt management or credentialing, in obtaining Plaintiff's family's reported IRS income" (FAC at 19:18-20).

For the preceding reasons, Plaintiff's fraud allegations satisfy the specific elements of Fed.R.Civ.P. Rule 9(b).

## B. Defendant(s)' Scienter: "Time-Barred" Defense Denied to Plaintiff

The premise of Plaintiff's response in opposition to Defendant(s)' motion to dismiss is based on Plaintiff being legally prohibited from claiming "time-barred" defenses against any legitimate action seeking to recover, enforce or encumber Plaintiff's student loan debt, the fact of which legally falls under the pinnacle jurisdiction of the United States Department of Education. In other words, Plaintiff owes property mandated to be returned to the United States Federal Government, unless discharged.[16]

Plaintiff is barred from claiming a statute of limitations defense regarding his student loan debt. "It is the purpose of this subsection to ensure that obligations to repay loans and grant overpayments are enforced without regard to any Federal or State statutory, regulatory, or administrative limitation on the period within which debts may be enforced." Higher Education Act ("HEA"), 20 U.S.C. § 1091a(a)(1) (as amended). This provision of federal law was specifically added by Congress, and signed into law, in 1991, the same year Plaintiff finished his studies at the University of Chicago, and two years before he started at New York University.[17] Pub. L. 102–26, § 3(a), Apr. 9, 1991, 105 Stat. 124.

Plaintiff's overriding and provable reason, since his employment termination at Clemson University in 2001 and returning to the United States in 2003, has been and

---

[16]    Plaintiff is willing to state under oath he registered with the United States Selective Service System on or about 1986, which remains a precondition for qualifying for most domestic student loans.

[17]    Plaintiff graduated from the University of Chicago with his bachelor's degree in 1990, while also finishing his master's degree, finally in June 1991. Thereafter, Plaintiff was admitted to NYU's graduate program in History in 1993. These facts are confirmable on official university transcripts.

continues to be that he has not had sufficiently stable and gainful employment, lasting longer than one year, during the past 14 years to provide the income to afford minimal housing and personal needs, including his medical needs, while at the same time making monthly student loan debt payments. Compl. at 7:21-26. After moving to California in 2003 (FAC 13:7-8), Plaintiff's loans, to his belief and knowledge, were consolidated at some point between on or about 2008 and 2011 (alleged here, and in the PSAC), subjected to a default by Plaintiff in or about 2011 (alleged here, and in the PSAC), administered through income-based plans (alleged here, and in the PSAC), placed on forbearance and deferment status numerous times (alleged here, and in the PSAC), and still, despite these facts, Plaintiff has not paid one dollar back to the loan servicer, "Nelnet," currently representing the United States Department of Education in communications with Plaintiff. Compl. at 7:26-28. Plaintiff and Plaintiff's spouse continue to honor their long-standing written and oral agreement that their marriage should not expose the non-indebted spouse to Plaintiff's student loan debt liabilities incurred at NYU. Docket No. 31; FAC 13:17-21.

Regarding the tolling of the statute of limitations, Plaintiff has summarized the facts above surrounding the 17-year history of managing his student loan debt. Given that 17-year history, Plaintiff believes the tolling of the statute of limitations is not a simple matter of looking to the Uniform Commercial Code (or its state variants) alone. UCC § 3-118 ("(a) Except as provided in subsection (e), an action to enforce the obligation of a party to pay a note payable at a definite time must be commenced within six years after the due date or dates stated in the note or, if a due date is accelerated, within six years after the accelerated due date."). Aside from the UCC, tolling comes down to one issue: since Plaintiff's default in or about 2011, Plaintiff has maintained reasonably regular contact with USDOE's loan servicers and their agents, and has not made a second default. In fact, Plaintiff believes his credentials remain valuable, unless

they were inherently fraudulent or have become fraudulently disvalued. Plaintiff has been an active member of the California State Bar continuously since 2009, his scholarship remains in circulation, and his dissertation is still available for purchase as a book. At this point, given the fact of Plaintiff's single default in or about 2011 and continued cooperation with federal authorities since,[18] and the fact of Plaintiff currently lacking permanent medical disability, it would be nearly impossible for Plaintiff to claim time-barred defenses, as a defendant, regarding his obligation to the United States Federal Government.

In addition to these, Plaintiff is barred from making due process challenges to any of: collection practices (National Consumer Law Center, Student Loan Law, § 8.4.5.1 (5th ed. 2015) (updated on-line) (herein after "NCLC, Student Loan Law"), federal benefits offset (NCLC, Student Loan Law § 9.4.3.4), statute of limitations elimination (NCLC, Student Loan Law § 8.5.3.1), tax refund offsets (NCLC, Student Loan Law § 9.2.6), or wage garnishments (NCLC, Student Loan Law § 9.3.5). Because Plaintiff cannot protest his indebtedness, in defense, by using the Fourteenth and/or Fifth Amendments (due process) of the United States Constitution, Plaintiff prosecutes his Civil Rights claims using the Thirteenth Amendment.

As regards issues of student loan origination, consolidation, documentation, Plaintiff believes information related to such, beyond what he himself possesses and has already shared with Defendant(s) (Compl. at Ex. B), can be obtained from databases or archives under the care and control of any number of sources, including the Federal Government, its agencies, departments and contractors, and possibly Defendant(s). Regardless of the primary origination of the capital lent to Plaintiff, which NYU facilitated from 1993-2000, Plaintiff alleges it can be shown that only NYU was the

---

[18]    Nelnet agents verbally insisted to Plaintiff on phone calls, in March 2017, that Plaintiff is no longer eligible for forbearances or deferments of his monthly student loan payments. Nelnet's representatives have since contradicted this information in recent phone conversations with Plaintiff.

primogenitor of all of Plaintiff's student loan debt – i.e., Defendant(s)' debt facilitation is the "but-for" cause of Plaintiff's lawsuit against Defendant(s).

    <u>Summary of Factual Foundation of Defendant(s)' Scienter</u>:   **1)** Federal law barring student loan debtors from claiming a statute of limitations defense was specifically added by Congress, and signed into law, in 1991, the same year Plaintiff finished his studies at the University of Chicago, and two years before he started at New York University (105 Stat. 124); **2)** in 1993, Plaintiff interviewed directly with Defendant Dr. William Nelson, who "assured Plaintiff that Plaintiff's enrolling in NYU and assuming student loan debt would be the initial part of NYU's offer to Plaintiff for his total graduate education, and at the time of his enrollment in 1993, Plaintiff told Defendant Dr. Nelson that Plaintiff intended to obtain a law degree from NYU, and Defendant Dr. Nelson supported … Plaintiff's law school goals" (FAC 8:6-14); **3)** after forming the ANTHES-NELSON AGREEMENT (FAC 8:28-9:1-5), "Plaintiff personally shared the ANTHES-NELSON AGREEMENT with the then-Dean of NYU School of Law and, later, former President of NYU, John Sexton" (FAC 9:6-8); **4)** "Defendant Dr. Nelson assured Plaintiff that NYU School of Law's 'Loan Repayment Assistance Program' was available to Plaintiff, like all NYU School of Law alumni" (FAC 9:13-16); **5)** "at no time did Defendants ever raise the possibility Defendants could cut ties with Plaintiff or renounce Plaintiff's credentials, which were presented as earned upon graduation" (FAC 9:25-28); **6)** Plaintiff discussed with Defendant(s) the urgency of finding post-graduation employment suitable to benefit from his credential and simultaneously repay his federal student loan obligations (FAC 11:9-16); **7)** Plaintiff and Defendant Dr. Nelson had a "falling out" after September 2001 (FAC 12:8-16); **8)** "In all in-person (emphasis: "in-person") visits since 2003, Plaintiff has interacted with New York University faculty and officials professionally, seeking their assistance so Plaintiff can use his NYU credentials in good faith, to enter the market place and honor his federal loan obligations" (FAC 4:7-

28, citing at lines 24-28).

Inferences: Further Facts Obtainable in Discovery:  **1)** Plaintiff prior to 1993 owed no student loan debt; **2)** prior to his enrollment at NYU in 1993, Plaintiff understood federal law regarding student loan debts and their non-dischargeable status in federal bankruptcy court; **3)** Defendant(s), and specifically Dr. William Nelson, knew in 1993 of federal law regarding student loans and their non-dischargeable status in federal bankruptcy court; **4)** Dr. Duane Corpis, the non-legal "partner" of Plaintiff (1990-2001), specifically knew in 1993 of federal law regarding student loans and their non-dischargeable status in federal bankruptcy court; **5)** Plaintiff defaulted on his student loan obligations in or about 2011; **6)** Plaintiff made repeated attempts over 16 years, in-person and through other means, to reach out to several different officials and agents of New York University and to their professional associates to try and address Plaintiff's indebtedness; **7)** Plaintiff made repeated attempts over 16 years, since leaving his teaching position at Clemson University in 2001, to obtain employment allowing Plaintiff to benefit from his NYU credentialing and to repay Plaintiff's student loan debts incurred at NYU; **8)** Plaintiff made repeated attempts over five (5) years to obtain government financial assistance regarding his long-term unemployment, indebtedness, and psychiatric and psychological diagnoses.

Judicial Notice has already been requested regarding the facts of Plaintiff's dissertation published as a book in 2003, admission to practice law in the State of California in 2009, and admission to practice in the United State District Court, Central District of California in 2010.

Legal Circumstances:  "The most efficient and complete way to get relief for school-related problems is often through a statutory discharge program."  NCLC, Student Loan Law," § 13.5.1.  Plaintiff, however, has repeatedly communicated both with the USDOE and its loan servicer about Plaintiff's persistent lack of income and

assets, without resolution.  Plaintiff asserts:  no reasonable doubt exists he does not

qualify for total and permanent medical disability student loan debt discharge, in

bankruptcy court or under administrative law.  Plaintiff repeats himself:  HEA declares

its purpose to be ensuring "obligations to repay loans and grant overpayments are

enforced without regard to any Federal or State statutory, regulatory, or administrative

limitation on the period within which debts may be enforced."  Thus, Plaintiff encourages

the Court to construe that purpose broadly to include not just the borrower but also the

educational institution which facilitated the debt in the first place, especially where that

institution has withheld from the debtor the specific repayment program generally made

available to its credentialed alumni:  "5 Things You Need to Know about NYU Law's

LRAP: 1) Our LRAP is one of the largest and most inclusive programs of any law

school; 2) You can earn up to $80,000 a year and have no monthly loan payment at all;

3) If you make a career change, our one-time payment assistance can protect you; 4)

Our LRAP covers bar study loans up to $10,000 and computer purchases up to $2,000;

5) NYU Law's LRAP lets you take time off if you need it"

("http://www.law.nyu.edu/financialaid/lrap").

As previously argued in Plaintiff's motion for venue change (Docket No. 44, at

11:22-28, 12:1-23), Plaintiff emphasizes that the statute of limitations defense may itself

be relevant in the Court determining the outcome of Plaintiff's venue change motion.

*Porter v. Groat*, 840 F.2d 255, 257 (4th Cir. 1988) ("Specifically in the instant case, we

read §1406(a) to authorize the transfer to the Eastern District of North Carolina when

the statute of limitations would bar adjudication on the merits in the Eastern District of

Virginia but not in the Eastern District of North Carolina.").  Plaintiff's treatment of both

Defendant(s)' "time-barred" claims and "tolling" regarding Defendant(s)' liabilities for

Plaintiff's student loan debt is sensitive to the California jurisdiction.  The three-year

statute of limitations for civil fraud set forth in the California Code of Civil Procedure

§338(d) does not begin or "toll" until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.  Plaintiff alleges discovering the fact of Defendant(s) obstructing Plaintiff's attempts to return federal property to the federal government in 2015 (above at page nine (email from Dr. Edward Purcell) and (Compl. at 5; FAC at 13:22-28, 14:1-7)).  Plaintiff re-signals the consequence of Defendant(s) raising "time-barred" defenses in the context of Plaintiff's motion for venue change to the Central District of California.

## C. <u>Defendant(s)' Wrong-Doing Is Highly Plausible</u>

As discussed above, the law concerning any 12(b)(6) Motion intends that the Court take an active role in drawing inferences, and so it is only after all non-conclusory facts have been assumed in the favor of the Plaintiff, and only after the Court draws reasonable inferences in favor of the Plaintiff, that "the court must determine whether the complaint alleges a plausible claim for relief." *Iqbal*. at 679.

Is it implausible Plaintiff has not worked for many years because his credentials, coupled with his debt, prejudices Plaintiff by pre-signaling to prospective employers Plaintiff's overriding financial priorities?  If Plaintiff's lack of sustained employment, over 16 years, had been <u>caused by illness</u>, then surely that cause would have been identified and confirmed by now, as Plaintiff has applied, appealed, and been denied for both his federal and state disability claims in the last five years, while at the same time completing a number of medical tests – memory, neurological, genetic – to diagnose concretely any mysterious mental health illness (beyond depression and anxiety connected to Plaintiff's student loan debt itself).  The fact that NYU offers its Loan Repayment Assistance Program ("http://www.law.nyu.edu/financialaid/lrap") to alumni, the fact that Plaintiff knew student loan debts had been declared non "dischargeable" by Congress two years before he enrolled at NYU (FA2 8:6-14), the fact that Plaintiff made

repeated efforts while at NYU from 1993 to 2001 to manage his debt liabilities (FAC: 9:13-16), and the fact that Plaintiff continued in 2002, 2003 and 2007 to make efforts after graduating from NYU (FAC: 4:7-28), all demonstrate Defendant(s)' **own** efforts at student loan debt mitigation by offering financial assistance to alumni.  Defendant(s)' "scienter" emerges from these facts.  Defendants withheld post-graduation assistance, over many years, with foreseeable and adverse consequences to Plaintiff.  If Defendant(s) feel justified in acting so towards Plaintiff, then they should positively assert such justification(s), with supporting evidence, in their formal, affirmative answer to Plaintiff's complaint, if Defendant(s)' conduct is not simply fraud.

Plaintiff urges the Court to recognize:  Defendant Dr. William Nelson, specifically, has the legal training, perspective, and administrative heft to enact his political preferences by directing NYU staff and employees to withhold NYU resources from alumni.  On his NYU faculty website, (previously identified in Plaintiff's motion for judicial notice (Docket Nos. 26-29 and 39-42)), Defendant Dr. William Nelson "features" one of his recent publications in legal history, which also happens to elucidate Defendant(s)' motives in Plaintiff's case:  Nelson, William E., "Political Decision Making by Informed Juries," 55 Wm. & Mary L. Rev. 1149 (2014) (further discussion about Defendant Dr. Nelson's long-term agenda to politicize law is beyond the scope of this memorandum, except Plaintiff notes the politicization of the law is a life-long theme in Dr. Nelson's scholarship).  In 2014, Dr. Nelson argued:  "I cannot plausibly urge that juries should be given plenary power to make political decisions about how the law should apply in every individual case.  But I can argue that there ought to be a presumption in favor of such jury power, and that the presumption should be overcome only when specific good reason exists to overcome it."  *Id.* at 1164.

In sum, Dr. Nelson revealed his scholarly support for near "plenary power" in politicized decision-making for at least well-informed jurors.  Given Dr. Nelson's highly

25

expert knowledge of United States history, including the Reconstruction Era, Jim Crow segregation and sharecropping, why wouldn't Dr. Nelson engage in politicization of Plaintiff's student loan debt, concerning the events of September 11, 2001 and the wars that ensued, if Dr. Nelson felt privately justified: "The United States was attacked like Pearl Harbor." FAC 12:6-7. In fact, Plaintiff's injuries fit the general pattern concerning the practice of Dr. Nelson's ideology: Plaintiff and Defendant Dr. Nelson had a severe and real political disagreement starting acutely in September 2001 and, thereafter, Defendant Dr. Nelson responded by withholding NYU's assistance from Plaintiff, as though Dr. Nelson believed "good reason exists to overcome" Plaintiff's reaching out for help based on his objective financial and professional needs.[19] While Plaintiff responded to his predicament by going further into debt, then taking and passing the California Bar Exam in 2008 (admission in May 2009), Plaintiff's tightly guided and restrained response to his indebtedness has left Plaintiff tightly guided and restrained with no reasonable opportunity to free himself of debt.[20] Now, Plaintiff's spouse is being dragged into Plaintiff's debt-slavery. And Plaintiff's outstanding principal balance owed to the United States Federal Government increases at an annual percentage rate.

## IV.    CONCLUSIONS

Plaintiff ends with the observation that the State of California enacted a "community property" legal regime for spouses. California Family Code §§ 760 and 771. While Plaintiff and Plaintiff's spouse have hired legal counsel to execute pre-

---

[19]    Plaintiff notes, in 2001, he alleged discriminatory treatment based on sexual orientation as contributing to his termination of employment at Clemson University in 2001. FAC at Ex. D.

[20]    "Debt bondage, also called bonded labour or debt slavery, is the most common form of modern slavery. Despite this, it's the least known. Debt bondage occurs when a person is forced to work to pay off a debt. They are tricked into working for little or no pay, with no control over their debt. Most or all the money they earn goes to pay off their loan. The value of their work becomes invariably greater than the original sum of money borrowed" ("https://www.antislavery.org/slavery-today/debt-bondage/").

nuptial and post-nuptial agreements in the context of California law, including legally insulating the non-indebted spouse from Plaintiff's federal student loan debt obligations, Plaintiff in 2015 "obtained a letter, previously submitted to this Court in the original Complaint, from the United States Department of Education to United States Senator Diane Feinstein, clearly stating spouse's income cannot be garnished to satisfy Plaintiff's federal student loan obligations."  FAC: 13:17-21.  This same letter, however, makes it clear that Plaintiff's Social Security income may be garnished, as well as any tax refund due to Plaintiff and his spouse as taxpayers filing jointly.  Compl. at Ex. C. Therefore, any decision immediately adverse to Plaintiff in this controversy has immediate and foreseeable consequences for Plaintiff's spouse, and their marriage, only recently protected by the United States Supreme Court.  *Obergefell v. Hodges*, 135 S. Ct. 2071, 576 US __, 191 L. Ed. 2d 953 (2015).

Plaintiff urges the Court to refuse Defendant(s)' attempts at weaponizing Plaintiff's student loan debts, and: 1) TAKE JUDICIAL NOTICE; 2) DENY Defendant(s)' motion to dismiss and set a calendar date for their answer; 3) GRANT Plaintiff's motion for venue change to the United States District Court, Central District of California; and 4) GRANT Plaintiff leave to file his [Proposed] Second Amended Complaint appearing in Plaintiff's affidavit concurrently filed with this memorandum.

Dated: <u>September 6, 2017</u>        Respectfully Submitted,

By: _____

LOUIS ANTHES,
ATTORNEY AT LAW, CBN 263059
P.O. BOX 2313
LONG BEACH, CA  90802
TEL: (562) 363-5052
dr.louis.anthes@gmail.com
PLAINTIFF IN *PRO SE*

27